[No. 56293-8. En Banc. September 20, 1990.]

THE STATE OF WASHINGTON, *Respondent,* v. GARY JEROME HANDLEY, *Petitioner.*

*Daly & MacFie, Keith A. MacFie,* and *Robert W. Van Dorn,* for petitioner.

*John W. Ladenburg, Prosecuting Attorney,* and *Chris Quinn–Brintnall, Senior Appellate Deputy,* for respondent.

BRACHTENBACH, J.—Defendant challenges his exceptional sentence contending (1) the trial court's reasons given for the exceptional sentence were based on evidence not properly part of the record, and (2) his exceptional sentence is a violation of equal protection because his codefendant was given a standard range sentence. The Court of Appeals upheld defendant's exceptional sentence. *State v. Handley,* 54 Wn. App. 377, 773 P.2d 879 (1989). Although our reasoning differs in part from that of the Court of Appeals, we also affirm defendant's sentence.

The crimes to which defendant pleaded guilty arose from the robbery and murder of an elderly woman. The actual acts of robbery and murder were committed by persons other than defendant. In June 1986, defendant Gary Handley and Tony Willoughby were hired by 87–year–old Grace Parks to paint her house. During the course of the job, Mrs. Parks befriended defendant, giving him gifts of food,

money, and jewelry. In early July, defendant and Willoughby discussed a plan to rob Parks of some rings owned and worn by her. On July 6, defendant and Willoughby went to Parks's residence, but left without carrying out the robbery. Later that day, Willoughby, together with Dan Klewin but without defendant, returned to Parks's residence, and, during the course of robbing Parks, Willoughby stabbed and suffocated her, causing her death. Willoughby and Klewin later met up with defendant, who attempted to assist Willoughby and Klewin in selling some of the jewelry stolen from Parks.

Willoughby pleaded guilty to aggravated first degree murder and was sentenced to life imprisonment. Klewin pleaded guilty to second degree murder and was sentenced to 144 months, a sentence in the middle of the standard range for his conviction. Defendant pleaded guilty to second degree possession of stolen property, first degree rendering criminal assistance, and first degree conspiracy to commit robbery. He was given an exceptional sentence of 81 months, twice the maximum presumptive range sentence for the conspiracy conviction.[1]

In imposing an exceptional sentence the trial court considered statements made by defendant and his attorney during sentencing, presentence reports from the State and defense counsel, defendant's statement on his plea of guilty, statements made by defendant and his codefendants soon after the crime, an autopsy report, and testimony from the medical examiner who conducted the victim's autopsy. In a presentence report submitted by defendant and at sentencing defendant objected to the trial court's consideration of some of the information contained in the State's

---

[1]Eighty–one months is twice the maximum presumptive range sentence for defendant's conspiracy conviction, the conviction with the most severe penalty. The record is not clear, but if the trial court imposed exceptional sentences for each of the three crimes our analysis would apply to each of defendant's exceptional sentences. In any event, because the sentences are to run concurrently, and for ease of discussion, we refer only to the 81–month sentence.

presentencing report, the out–of–court statements made by him and his codefendants, and the autopsy report.

As required by RCW 9.94A.120(3), the court explained its reasons for imposing the exceptional sentence in written findings of fact and conclusions of law. The court found:

> The 87 year old victim, frail and small in stature, especially compared to defendants Willoughby and Handley, resided alone. She employed the defendants to paint her residence and also befriended defendant Handley with gifts of food, money and, according to defendant Handley, various jewelry items. The jewelry items which were the object of the robbery were rings which the 87 year old victim wore on her fingers. The defendant knew or should have known that there was a high probability that the 87 year old victim would receive substantial injury if robbery of the rings were accomplished.

Finding of fact 3. Clerk's Papers, at 2–3.

From these findings, the trial court concluded: (1) that the defendant knew or should have known that the victim was particularly vulnerable, (2) that the defendant knew or should have known that there was a high probability of substantial injury to the victim if the robbery were accomplished, and (3) that the defendant, as an employee and friend of the victim, abused a position of trust in the commission of the offenses. Conclusions of law 2, 3, 4. Clerk's Papers, at 3–4.

### RCW 9.94A.370(2)

The Court of Appeals concluded that the reasons for the exceptional sentence were supported by the record, that those reasons justified the exceptional sentence, and that the term of the sentence was not clearly excessive. *See* RCW 9.94A.210(4). We agree.

Defendant contends that the evidence supporting the reasons for imposing an exceptional sentence was not properly considered by the sentencing court under RCW 9.94A-.370(2). Based on this argument, defendant maintains that his sentence should be reversed because "the reasons supplied by the sentencing judge are not supported by the record". RCW 9.94A.210(4)(a).

We separate defendant's argument into two parts. First, we consider whether the sentencing court properly considered some sources of information. Second, we consider whether the defendant's objections to certain information should have precluded the sentencing court from considering that information.

In addition to the presentence reports and testimony, the trial court considered the defendant's statements in court, his recorded statement, the recorded statements of his two codefendants, an autopsy report, and testimony of the medical examiner. Defendant contends that under RCW 9.94A.370(2) the only information which should have been part of the record for sentencing purposes was his statement on plea of guilty, the medical examiner's testimony, and the portions of the presentencing reports to which he did not object. When only that evidence is considered, defendant maintains, the trial court's findings of fact and conclusions of law are not supported by the record.

RCW 9.94A.370(2) provides in relevant part:

> In determining any sentence, the trial court may rely on no more information than is admitted by the plea agreement, or admitted, acknowledged, or proved in a trial or at the time of sentencing. Acknowledgement includes not objecting to information stated in the presentence reports. Where the defendant disputes material facts, the court must either not consider the fact or grant an evidentiary hearing on the point.

RCW 9.94A.370(2) expressly refers to: (1) information which is admitted in a plea agreement, (2) information which is admitted, acknowledged, or proved in a trial or at the time of sentencing, and (3) information stated in presentence reports. Our task is to determine whether the Legislature intended to permit the sentencing court to consider information from sources other than plea statements and presentence reports.

Before proceeding to this task, we note the particular significance of this question in a case like this one. Where the defendant pleads guilty, but his plea statement and the presentence reports provide insufficient information about the circumstances surrounding the crime, a sentencing

judge must somehow be able to learn of the circumstances surrounding the crime to determine whether an exceptional sentence is called for.[2]

We first look to the language of RCW 9.94A.370(2) and note that the statute clearly demonstrates that a sentencing court may rely on information produced by something less than the usual adversarial process ("information . . . admitted, acknowledged, or proved . . ."); *see also State v. Herzog*, 112 Wn.2d 419, 430–31, 771 P.2d 739 (1989). We also note that the statute does not expressly identify plea statements and presentence reports as the *only* sources of information to be considered by the sentencing court.

Furthermore, "a sentencing judge is not limited to consideration of facts that would be admissible at trial." *Herzog*, at 430.

> In considering the various alternatives available in the sentencing process, a trial judge is not bound to follow the recommendation of a presentence report but may make whatever investigation he deems necessary. . . . In fact, the judge may obtain as much information as is available about the circumstances of the crime, the defendant's past life, and his personal characteristics.

(Citations omitted.) *State v. Blight*, 89 Wn.2d 38, 41, 569 P.2d 1129 (1977).

To some extent, the Sentencing Reform Act of 1981 (SRA) has limited the trial court's sentencing discretion. For example, in *State v. Nordby*, 106 Wn.2d 514, 518 n.4, 723 P.2d 1117 (1986), we said that "the sentencing judge may not list the offender's criminal history as a reason to justify an exceptional sentence since criminal history is one of the two components . . . used to compute the presumptive range . . .." Thus, the sentencing court's discretion was

---

[2] "An exceptional sentence is appropriate when the circumstances of a particular crime distinguish it from other crimes within the same statutory definition." *State v. Fisher*, 108 Wn.2d 419, 424, 739 P.2d 683 (1987) (citing D. Boerner, *Sentencing in Washington* § 9.6 (1985)).

limited for the purpose of preventing a court from considering information already considered in the calculation of the standard range.

Unlike criminal history, the particular circumstances surrounding a crime are not factored into the calculation of the standard range. Yet, as noted earlier, it is exactly those unique circumstances which determine the appropriateness of an exceptional sentence. *State v. Fisher*, 108 Wn.2d 419, 424, 739 P.2d 683 (1987). To interpret the statute as permitting the sentencing court's consideration of information obtained from sources such as earlier out–of–court statements made by a defendant and his codefendants as well as medical reports such as an autopsy report is, therefore, consistent with this purpose of sentencing.

Furthermore, the defendant is protected from consideration of unreliable or inaccurate information because when "the defendant disputes material facts, the court must either not consider the fact or grant an evidentiary hearing on the point." RCW 9.94A.370(2). This procedure safeguards the defendant's right to know and object to adverse facts. *State v. Ammons*, 105 Wn.2d 175, 185, 713 P.2d 719, 718 P.2d 796, *cert. denied*, 479 U.S. 930 (1986). If the defendant does not exercise this right, the facts are deemed acknowledged for purposes of the sentencing judge's consideration. RCW 9.94A.370(2); *Herzog*, at 432. Here, the State's offering of the autopsy report and its subsequent presentment of the medical examiner's live testimony demonstrates how the statute works. Once defendant objected to consideration of the autopsy report, the court received live testimony from the medical examiner.

We conclude that RCW 9.94A.370(2) does not limit the sources, as compared to the proof thereof, of information to which a sentencing court may look because there is no express limitation in the statute, because consideration of additional sources will enable the sentencing court to learn of the particular circumstances surrounding the crime, and because the accuracy and reliability of the information can

be checked when the defendant exercises his right to an evidentiary hearing.

 Next, we must determine whether defendant sufficiently objected to the sentencing court's consideration of any of the specific information relied upon in imposing the exceptional sentence. If defendant did not object to information presented at sentencing, that information is deemed acknowledged. RCW 9.94A.370(2); *Herzog,* at 432.

The trial court found and concluded that the victim was particularly vulnerable and that defendant knew or should have known of the high probability that the victim would receive substantial injury if robbery of her rings was accomplished. Defendant claims that he sufficiently objected to the evidence supporting these findings of fact and conclusions of law. We disagree.

The medical examiner testified that the victim was particularly vulnerable due to her age and size. This witness also testified that removing rings from such a frail person would create a risk of injury to the victim. Indeed, the defendant himself testified at his sentencing that he was aware of the differences in size and strength between the victim and Willoughby. He stated, "The woman [Mrs. Parks] ha[d] no fight in her. . . . You've seen Mr. Willoughby. . . . He's a big, husky man." Report of Proceedings, at 32 (July 1, 1987). Also during sentencing, and without objection from defendant, defendant's counsel acknowledged the likelihood of injury to the victim if robbery of rings from her person was accomplished. We conclude that this evidence, which is not disputed by defendant, supports the sentencing court's findings of fact and conclusions of law regarding the vulnerability of the victim and defendant's knowledge of the risk of harm to the victim.

The trial court's decision to impose an exceptional sentence was also based upon its conclusion that petitioner abused a position of trust when he committed his offenses. *See* RCW 9.94A.390(2)(c)(iv). *See also State v. Fisher, supra* at 426–27. This finding is supported by information

presented to the sentencing court which was not disputed by defendant.

The State's presentence report states that defendant was a housepainter for the victim. Defendant did not object to this statement and, in fact, admitted that on the day of the murder he went to the victim's house and the victim fixed him lunch. Defendant admitted that the victim had befriended him with gifts of money and jewelry. From this evidence, the trial court could have found that the relationship between defendant and Mrs. Parks placed him in a position of trust with the victim. *State v. Davis,* 47 Wn. App. 91, 95, 734 P.2d 500 (housepainter abused position of trust by persuading elderly burglary victim to allow his entry into home), *review denied,* 108 Wn.2d 1029 (1987).

We conclude that the sentencing court's reasons for imposing an exceptional sentence were based on information properly considered under RCW 9.94A.370(2). Therefore, the reasons given were supported by the record and the sentence will not be reversed on that ground.

Next, defendant argues that the sentencing court's reasons do not justify an exceptional sentence. We agree with the Court of Appeals that the reasons do justify imposing an exceptional sentence. RCW 9.94A.210(4)(a).

Defendant first argues that he never intended for the victim to be harmed or killed and, therefore, the sentencing court's reasons do not justify an exceptional sentence. Although we find it difficult to imagine how the defendant could have anticipated robbing an elderly woman of jewelry from her person without intending to inflict injury, defendant's *intent* was not one of the reasons given by the trial court for imposing an exceptional sentence. The trial court found that the defendant *knew or should have known* that the victim was particularly vulnerable and that there was a high probability that the 87–year–old victim would receive injury if robbery of the rings were accomplished. Defendant's argument fails because he does not distinguish between his *intent or lack of intent* to cause

harm and the trial court's finding that he *knew or should have known* of the probability of substantial injury to the victim if the planned offense was carried out. Evidence regarding defendant's *intent* is simply not relevant to the question of whether an exceptional sentence was justified.

 Defendant also contends that the "abuse of trust" reason did not justify an exceptional sentence because he was not present during the robbery and murder. Defendant's argument ignores the possibility that one can abuse a position of trust in the planning of a crime (the conspiracy) even when not actually present when the primary crime (the robbery and murder) is carried out.

Defendant's argument also ignores his own admissions regarding his relationship with the victim.[3] Defendant admitted that he worked as a housepainter for the victim; that the victim had given him gifts of food, money, and jewelry; and *that on the day of the murder* he had been to the victim's home several times, including one visit to request that the victim fix lunch for him and Willoughby and one visit to eat the lunch. From defendant's admissions regarding his relationship with the victim it is apparent that the elderly woman believed defendant was her friend and could have reasonably assumed that he and his companions presented no threat to her well–being. Thus, defendant's relationship with the victim, which included visits to her home and accepting her gifts, lulled the victim into a special relationship of trust with defendant. This trust led to the victim's willingness to open her doors to her would–be murderer.

Regardless of defendant's intent and despite the fact that defendant was not present during the robbery and murder, the circumstances surrounding defendant's role in planning

---

[3]During sentencing defense counsel stated that defendant had never wavered from his initial explanation of what had occurred. Report of Proceedings, at 20 (July 1, 1987). That explanation was contained in his statement given to the police 1 day after the robbery and murder.

the crime, as explained by the sentencing court in its findings of fact and conclusions of law, justify imposing an exceptional sentence.

In summary, we hold that a sentencing court may rely on information which is admitted, acknowledged, or proved at the time of sentencing or at trial and that the sources for obtaining this information are not limited to presentence reports or plea statements. Furthermore, to dispute any of the information presented for consideration, a defendant must make a timely and specific challenge. If a defendant does make such a challenge, the court must either hold an adversary hearing or not consider the properly challenged information.

These holdings illustrate that the statute permits a sentencing judge to consider information from unrestricted sources so long as a defendant's right to challenge particular information is granted.

We further hold that a defendant's lack of intent that the victim be injured is not controlling when a defendant knew or should have known that the victim was particularly vulnerable and that it was likely that the victim would be injured. We also hold that a defendant need not be physically present at the scene of the crime to have abused a position of trust.

## EQUAL PROTECTION ANALYSIS

Next, we determine whether the defendant's equal protection rights were violated when he received an exceptional sentence but his codefendant Klewin received a standard range sentence.

Defendant contends that there is no rational basis for the trial court's imposing an exceptional sentence on him but not on his codefendant Klewin. Absent a rational basis for this disparity, defendant concludes his sentence violates equal protection. The Court of Appeals did not consider whether there was a rational basis for any disparity between the sentences given the codefendants because it

ruled that equal protection principles would not be implicated when codefendants were given disparate sentences unless there was a clear showing of intentional or purposeful discrimination. Because defendant did not make such a showing, the court refused to consider defendant's equal protection challenge. *State v. Handley,* 54 Wn. App. 377, 383, 773 P.2d 879 (1989).

Prior to this case, the Court of Appeals invoked a rational basis test when disparate sentences of codefendants were challenged as offending equal protection principles. *See State v. Clinton,* 48 Wn. App. 671, 679, 741 P.2d 52 (1987); *State v. Portnoy,* 43 Wn. App. 455, 464–65, 718 P.2d 805, *review denied,* 106 Wn.2d 1013 (1986); *State v. Turner,* 31 Wn. App. 843, 847, 644 P.2d 1224, *review denied,* 97 Wn.2d 1029 (1982); *State v. Bresolin,* 13 Wn. App. 386, 397, 534 P.2d 1394 (1975), *review denied,* 86 Wn.2d 1011 (1976); *State v. Hurst,* 5 Wn. App. 146, 149, 486 P.2d 1136 (1971). Beginning with *Hurst,* the Court of Appeals assumed that equal protection concerns are always implicated whenever codefendants receive disparate sentences. In this case the Court of Appeals moved away from that approach when it held "that absent a clear showing of 'intentional or purposeful discrimination,' this court will not review a sentence because of disparity." *Handley,* at 383.

The Court of Appeals here correctly reasoned that "[b]ecause trial courts have discretion to establish sentence duration, they necessarily have discretion to impose disparate sentences upon codefendants." *Handley,* at 383 (citing *State v. Barton,* 75 Wn.2d 947, 950, 454 P.2d 381 (1969) (upholding the imposition of the statutory maximum sentence of 20 years when a 1–year sentence could have been imposed)). *See also State v. Herzog,* 112 Wn.2d 419, 424, 771 P.2d 739 (1989) (in the context of sentencing discretion within the standard range, "according wide latitude to the sentencing judge comports with the view that 'the punishment should fit the offender and not merely the crime"); *State v. Mak,* 105 Wn.2d 692, 724, 718 P.2d 407 (even in

the context of capital cases, "every defendant who commits the same type of crime, or indeed the same crime, will not necessarily be given the same penalty"), *cert. denied,* 479 U.S. 995 (1986).

In deciding that no equal protection rights were implicated here, the Court of Appeals found federal decisions persuasive. *United States v. Endicott,* 803 F.2d 506, 510 (9th Cir. 1986); *United States v. Garrett,* 680 F.2d 650, 652 (9th Cir. 1982). The Court of Appeals concluded that the Ninth Circuit views the imposition of disparate sentences on codefendants as within the trial court's discretion, with the implication that disparate sentences, alone, do not call for an equal protection analysis. *Handley,* at 383.

The federal cases relied upon by the Court of Appeals do not, however, necessarily conclude that disparate sentences never implicate equal protection guaranties. The *Endicott* opinion does not reveal whether the defendant made an equal protection argument. Although the Ninth Circuit ultimately rejected an equal protection challenge in *Garrett,* the court did so only after noting that the codefendants were convicted of a different number of crimes, that the trial court had found that the degree of culpability between the codefendants varied, *and* that the nature of the federal sentencing process was to afford the federal sentencing judge wide discretion, within statutory guidelines. *Garrett,* at 652. The Ninth Circuit's reasoning suggests that it was applying an equal protection analysis.

The Court of Appeals also relied upon *State v. Nixon,* 10 Wn. App. 355, 358, 517 P.2d 212 (1973) (involving prosecutorial discretion in enforcing a habitual offender statute), *review denied,* 83 Wn.2d 1014 (1974) to conclude that a disparate sentence would not be reviewed unless a defendant could show "intentional or purposeful discrimination." *See also State v. Lee,* 87 Wn.2d 932, 936–37, 558 P.2d 236 (1976) (finding no equal protection violation when the defendant was not selected for prosecution "on the basis of some unjustifiable standard such as race, religion, or other arbitrary classification", but rather was selected because he

clearly met the requirements of the habitual criminal statute), *appeal dismissed,* 432 U.S. 901 (1977). Because *Nixon* and *Lee* concerned the discretion involved in prosecutorial charging decisions and not a trial court's sentencing discretion which is at issue here, we do not rely on these cases, but instead look to cases dealing directly with sentencing decisions.

Under our present sentencing law a sentencing judge does not have unlimited discretion to sentence, rather the court is granted discretion within statutory guidelines. Apparently the Court of Appeals viewed the strictures of the SRA as sufficiently protective of constitutional rights. Although the SRA removed some of the sentencing court's discretion, it does not automatically insulate all sentencing decisions from constitutional challenge. "[T]he passage of the sentencing reform act does not affect the applicability and durability of the equal protection clause. RCW 9.94A must conform to, and be tested by, constitutional standards, not vice versa." *Clinton,* at 679.

This court has found equal protection guaranties implicated in some sentencing contexts. *E.g., State v. Dictado,* 102 Wn.2d 277, 297, 687 P.2d 172 (1984) ("equal protection is violated when two statutes declare the same acts to be crimes, but penalize more severely under one statute than the other"), *overruled on other grounds in State v. Short,* 113 Wn.2d 35, 40, 775 P.2d 458 (1989); *State v. Bartholomew,* 104 Wn.2d 844, 849, 710 P.2d 196 (1985) (unfettered discretion of the prosecutor in sentencing decisions would violate equal protection where two defendants, in identical situations, could have their penalties decided differently).

■■ As in other contexts, sentencing decisions will be subjected to equal protection scrutiny only if basic equal protection principles are implicated. "A denial of equal protection may occur when a valid law is administered in a manner that unjustly discriminates between similarly situated persons." *Stone v. Chelan Cy. Sheriff's Dep't,* 110 Wn.2d 806, 811, 756 P.2d 736 (1988). However, no equal protection claim will stand unless the complaining person

can first establish that he or she is similarly situated with other persons. *Stone,* at 812. In other words, only after the defendant establishes membership in a class will a court engage in equal protection scrutiny.[4]

For example, when a defendant demonstrated that she was similarly situated to others receiving different treatment, *i.e.,* that she was a member of a specific class, we have invoked the equal protection rational basis test to determine whether a defendant's constitutional rights were violated. *State v. Judge,* 100 Wn.2d 706, 713, 675 P.2d 219 (1984) (applying equal protection scrutiny but finding no equal protection violation when the decisions to prosecute a driver for negligent homicide, but not prosecute her companion who had allegedly purchased the alcohol, were rationally based on the prosecutor's ability to prove the charges).

Applying equal protection principles to the context of sentencing codefendants, two rules are derived: (1) if a defendant can establish that he or she is similarly situated with another defendant by virtue of near identical participation in the same set of criminal circumstances, then the defendant will have established a class of which he or she is a member. Only after membership in such a class is established will equal protection scrutiny be invoked. Then, only if there is no rational basis for the differentiation among the various class members will a reviewing court find an equal protection violation. (2) If a defendant is a member of a suspect class and can establish that he or she received disparate treatment because of that membership, *i.e.,* that there was intentional or purposeful discrimination, then we

---

[4]In addition to equal protection principles, this court and the United States Supreme Court have found due process principles implicated in sentencing. *E.g., Bearden v. Georgia,* 461 U.S. 660, 665, 76 L. Ed. 2d 221, 103 S. Ct. 2064 (1983); *State v. Herzog,* 112 Wn.2d 419, 426, 771 P.2d 739 (1989). The due process inquiry asks whether the complained of treatment is so arbitrary or unfair as to amount to a denial of due process, whereas the equal protection inquiry asks why similarly situated individuals are treated differently. *Bearden,* at 665 n.8. Here, defendant raised only an equal protection challenge.

will invoke equal protection scrutiny. To the extent that the Court of Appeals in this case held that only the second of these two rules was valid, that holding is reversed.

There is no evidence in the record of intentional or purposeful discrimination. Therefore, we consider whether defendant's equal protection challenge can be sustained under the first rule. To determine whether the codefendants in this case were similarly situated, or members of the same class, it is helpful to compare the positions of the codefendants in the earlier Court of Appeals cases which invoked equal protection scrutiny. In each of the earlier cases the codefendants were at the scene of the offenses together and were charged with many, if not all, of the same crimes. *State v. Clinton,* 48 Wn. App. 671, 741 P.2d 52 (1987) (codefendants together at three crime scenes, each charged with three counts of first degree rape and three counts of first degree burglary); *State v. Portnoy,* 43 Wn. App. 455, 718 P.2d 805 (codefendants together at robbery scene, each codefendant charged with three of the same crimes, one defendant charged with one additional crime), *review denied,* 106 Wn.2d 1013 (1986); *State v. Turner,* 31 Wn. App. 843, 644 P.2d 1224 (codefendants together at scene of crime), *review denied,* 97 Wn.2d 1029 (1982); *State v. Bresolin,* 13 Wn. App. 386, 534 P.2d 1394 (1975) (all three codefendants together at scene of crime, all charged and convicted of same crimes), *review denied,* 86 Wn.2d 1011 (1976); *State v. Hurst,* 5 Wn. App. 146, 486 P.2d 1136 (1971) (codefendants charged and convicted of same three crimes). These few cases illustrate that it is the exception rather than the rule which creates an equal protection class of codefendants.

In contrast, defendant was not present at the scene of the crime, nor were any of the crimes with which he was charged the same crimes with which his codefendants were charged. Although the criminal activity of all three codefendants led to the robbery and murder of one victim, the codefendants' roles differed significantly. Because of these

differences, defendant cannot establish that he was similarly situated with his codefendant Klewin.

Because we hold that defendant did not establish that he and his codefendants were members of a particular class, we need not reach the question of whether there was a rational basis for the trial court's differentiation between defendant and his codefendants. Although we do not reach that question, we note that there were many sustainable reasons for the trial court's different sentencing treatment of these codefendants. "Relevant distinctions need not pertain only to the codefendants' relative culpability or to the pleas to which they agreed, but may pertain to anything which provides a rational basis for the disparate sentences." *Clinton,* at 680. In addition to relative culpability, courts compare factors such as criminal record, rehabilitation potential, cooperation with law enforcement, and differences in pleas. *See, e.g., People v. Centanni,* 164 Ill. App. 3d 480, 493, 517 N.E.2d 1207 (1987) (noting that "an arbitrary and unreasonable disparity between the sentences of codefendants who are similarly situated is impermissible," but if the disparity is warranted by differences in the defendant's participation, criminal record, relative maturity, rehabilitative potential, or willingness to cooperate with law enforcement, the disparity of sentences will not be disturbed).

Here, defendant, unlike Klewin, was an employee and friend of the victim. Defendant was older than Klewin (21 compared to 18). The codefendants pleaded guilty to different crimes. While defendant may be less culpable than his codefendant Klewin, culpability is only one factor to be considered. Considering all these circumstances, even if we concluded that these codefendants comprised one class, we would still hold that there was a rational basis for the trial court's differentiation between defendant and his codefendant.

Finally, defendant maintains that he "factually," but not "legally," withdrew from the burglary conspiracy. We

understand defendant's argument to be that although he did not know the legal requirements for withdrawing from a conspiracy, when he refused to carry out the crime earlier in the afternoon of the robbery and murder, he withdrew from the crime as a matter of fact. Two of the crimes to which defendant pleaded guilty, possession of stolen property and rendering criminal assistance, occurred after the robbery and murder of the victim. Therefore, it is difficult to accept defendant's assertion that he factually withdrew from criminal activity prior to the robbery and murder. However, assuming the facts sustained this contention, we address the merits of his argument.

It is unclear whether defendant advances his "factual withdrawal" argument to support his equal protection argument by comparing his codefendants' and his own culpability or to attack the trial court's reasons for imposing the exceptional sentence.

█ If defendant makes this argument for the purpose of comparing the participants' relative culpability, he may be confusing the nature of an anticipatory offense, such as conspiracy, with the nature of accomplice liability. Whereas an anticipatory offense "is a crime separate, distinct from, and unincluded in the crime which the conspirators have agreed to commit", *State v. Gladstone,* 78 Wn.2d 306, 311, 474 P.2d 274, 42 A.L.R.3d 1061 (1970), "[t]here is no separate crime of being an accomplice; [instead] accomplice liability is principal liability." *State v. Toomey,* 38 Wn. App. 831, 840, 690 P.2d 1175 (1984), *review denied,* 103 Wn.2d 1012, *cert. denied,* 471 U.S. 1067 (1985). While a "withdrawal" defense to accomplice liability is expressly recognized by statute, RCW 9A.08.020(5)(b), it is unclear whether a similar defense to anticipatory offenses is available. Even if such a defense is available, defendant has already pleaded guilty to the conspiracy offense. Defendant may not now advance a position inconsistent with that admission of legal responsibility.

If defendant is using his "factual withdrawal" argument to attack the trial court's reasons for imposing an exceptional sentence, his argument fails because he mischaracterizes the trial court's findings of fact and conclusions of law. The trial court found and concluded that defendant *knew or should have known* of the possibility of harm to a vulnerable victim if the robbery were carried out by the other participants. Defendant's *intent to participate* in the actual robbery and murder is not relevant to the trial court's reasoning. Therefore, even if we assume that defendant intended to withdraw from the robbery conspiracy, we would still affirm the reasons for imposing an exceptional sentence.

To summarize, the reasons given by the sentencing judge are supported by the record and justify the sentence outside the standard range. RCW 9.94A.210(4). We find no equal protection violation. Defendant's sentences are affirmed.

CALLOW, C.J., and UTTER, DOLLIVER, DORE, ANDERSEN, DURHAM, SMITH, and GUY, JJ., concur.